The Wabash, St. Louis and Pacific Railway Co. *v.* Locke, Administrator.

Filed Nov. 28, 1887.

No. 12,576.

# THE WABASH, ST. LOUIS AND PACIFIC RAILWAY COMPANY *v.* LOCKE, ADMINISTRATOR.

NEGLIGENCE.—*Purely Accidental Occurrences.*—Where an event takes place, the real cause of which can not be traced, or is at least not apparent, it ordinarily belongs to that class of occurrences designated as purely accidental, and, there being no presumption of negligence in such cases, the party who asserts negligence must show enough to exclude the case from the class mentioned.

SAME.—*Railroad Company.*—*Duty to Persons Lawfully Upon Its Grounds.*— A railroad company owes to one, not a servant of the company, who is lawfully engaged in loading a car upon its side-track, the duty to have its premises in a reasonably safe condition, and to prevent damage to him, and others having occasion to transact business with it, from any unseen or unusual danger of which it has knowledge, or by the exercise of reasonable vigilance and sagacity should have knowledge.

SAME.—*Accidents Prima Facie Unavoidable.*—*Burden of Proof.*—The obligation of the railroad company does not require it to make its depot and grounds absolutely safe, and where the circumstances of the accident suggest, at first blush, that it may have been unavoidable, notwithstanding ordinary care, the plaintiff charging negligence must show that the defendant has violated a duty incumbent upon it, from which the injury followed in natural sequence.

SAME.—*Anticipation of Accident.*—The proper inquiry in such cases is not whether the accident might have been avoided if the company had anticipated its occurrence, but it is whether, taking the circumstances as they then existed, the company was negligent in failing to anticipate and provide against the occurrence by the use of such reasonable precautions as would have been adopted by prudent persons.

The Wabash, St. Louis and Pacific Railway Co. v. Locke, Administrator.

SAME.—*Structures and Appliances.*—*Failure to Anticipate Accident.*—When a structure or appliance, such as is in general use, and which is not inherently dangerous, has uniformly answered the purpose for which it was designed and used, under every condition supposed to be possible in the business, it can not be said that a person has not acted with ordinary prudence if he fails to anticipate an accident which afterwards happens in its use when substantially in its usual condition.

SAME.—*Telegraph Wires Over Railroad Track.*—Where telegraph wires at a railroad station are stretched over the track, trains daily passing under them, the railroad company is only bound to anticipate such combinations of circumstances and accidents and injuries therefrom as it may reasonably forecast as likely to happen, taking into account its own past experience and the experience and practice of others in similar situations, together with what is inherently probable in the condition of the wires as they relate to the conduct of its business.

SAME.—*Displacement of Wire by Contact with Brakeman.*—*Injury to Third Person.*—A brakeman over six feet high was standing erect upon a moving freight car some inches higher than the average. In passing under telegraph wires stretched over the track, at the station, his head came in contact with a wire, which, from an unexplained cause, had become slackened, thus breaking the insulator and causing the wire to fall. It coiled around a man at work upon a flat-car twenty-five feet from the main track, and, catching upon a brake-handle of the moving train, dragged him from the flat-car and inflicted injuries resulting in his instant death. The tall brakeman and others had daily passed under the wires without thought of contact therewith, and apprehended no danger from that cause.

*Held,* that the accident was one which the railroad company was not bound to anticipate, and it is not liable.

SAME.—*Jury.*—*Province of.*—*Inference of Negligence.*—A jury can not arbitrarily infer negligence, but the evidence must affirmatively establish circumstances from which the inference fairly arises that the accident resulted from the want of some precaution which the defendant ought to have taken.

From the Wabash Circuit Court.

C. B. *Stuart* and W. V. *Stuart,* for appellant.

J. L. *Farrar,* J. *Farrar,* H. J. *Shirk* and J. *Mitchell,* for appellee.

MITCHELL, C. J.—Abia K. Locke, as administrator of the estate of John Bradley, deceased, brought this action against the Wabash, St. Louis and Pacific Railway Company and the

Western Union Telegraph Company to recover damages for wrongfully causing the death of Bradley.

There was a verdict against both defendants below, and a judgment against the railway company alone.

The evidence most favorable to the plaintiff tended to establish the following facts:

On the 14th day of November, 1882, John Bradley, a citizen of Wabash county, aged about forty-four years, was engaged with some workmen in loading logs on a flat-car, which stood upon one of the side-tracks on the south side of the railway company's main line at Keller's Station. The side-track upon which the flat-car stood was twenty-five feet distant from the main line, which ran east and west, there being also another track between the main line and side-track above mentioned. The depot was on the north side of the main line, and a short distance easterly from the place occupied by the flat-car.

The Western Union Telegraph Company had a line of telegraph poles of the usual height, which supported a number of telegraph wires, in the customary manner, running east and west along the south side of the railway company's right of way. In order to afford facilities for telegraphic communication to and from the station, the company carried some of its wires from a pole standing on the south side of the right of way, and west of the depot, and west of the point where the flat-car stood, diagonally across the tracks to a pole on the north side of the right of way, and thence eastwardly along the north side into an office in the depot building.

These wires had been placed across the track about the year 1874, and had been maintained substantially in the same position until the happening of the accident which gave rise to this suit. One of the wires was used by the railway company in its business. The others were employed in the business of the telegraph company.

While Bradley was occupied with his work on the flat-car, the location of which has been described, an east bound

freight train, running on its usual time, at a moderate rate of speed, approached the station over the main track. On one of the cars, which was of a height somewhat above that of an ordinary freight-car, stood a brakeman six feet three and one-half inches in height. His head came in contact with one of the wires which crossed the track in the manner above described, the wire striking the back of his head or neck, about the lower part of the ear. A slight bruise was the extent of the injury suffered by the brakeman. The effect of the contact was, however, to break the insulator on the south pole, thereby causing the wire to become detached from its place, and to fall down on the top of a moving car. One of the brake-handles which extended above the car to the usual height caught the wire and carried it forward with the moving train.

In falling, the wire in some unaccountable manner coiled around the body of Bradley as he stood on the flat-car, and, being carried eastward by the moving train, the wire dragged him from the car on which he stood, and eastward in the direction the train was proceeding, some 125 feet, inflicting injuries which resulted in his instant death.

So far, the facts are substantially undisputed, except that the brakeman who came in contact with the wire testified that the car upon which he stood was of the ordinary height, while witnesses for the plaintiff, not connected with the train, reckoned it to be from twelve to eighteen inches above an average.

The "tall brakeman," as he is described, testified that he had passed under the wires, standing erect on the top of the cars, almost daily for sixty days immediately preceding the accident, without thought of danger, and without supposing that he could touch the wires. He passed under it the day before, as he and many others had frequently done at other times, without stooping his head or apprehending danger. During all the years that the wires crossed the tracks, brakemen standing on cars of various heights had passed under

them many thousand times, and it had never been suggested or supposed that there could be any contact between persons standing on the top of trains and the telegraph wires. The superintendent of the telegraph line and the line repairers had passed along the line frequently and regularly, and had discovered no defect or displacement of the wires or fastenings at the place in question.

The record contains no direct notice of any kind from any source that the wires were dangerous. If there was any notice at all it was such as the structure itself and the position of the wires thereon afforded.

The evidence tends to show that one of two things made the accident possible. The plaintiff's case proceeded upon the theory that one of the telegraph wires had " sagged " some ten or twelve inches below its usual and proper height, and that a brakeman some inches taller than the average, standing erect on a car some twelve to eighteen inches above the ordinary height, came in contact with the depressed wire.

There was some evidence tending to show that one of the wires had presented the appearance of being slackened and somewhat lower than the other for some months prior to the accident. All the railroad and telegraph men, however, disputed this fact, the latter affirming that a " sagged " wire in the position of the one described could not have been used, and that these wires were all in daily use.

The defendant's theory was that the guy-wire which held the north telegraph pole in position had been broken or cut a short time prior to the accident, and that, on account of the breaking or cutting thereof, of which it remained ignorant until after the accident, the top of the pole was slightly pulled to the south, thus making contact with the wires possible under the peculiar circumstances of this case.

The jury adopted the plaintiff's theory. Assuming, therefore, that the evidence justified the jury in finding that one of the wires had by some means become lowered in the center, and that it continued in that position for a period of

six or eight months before the accident, so that a brakeman six feet three and one-half inches in height, standing erect on a freight-car from twelve to eighteen inches above the height of an ordinary car, might come in contact with the wire in the manner already described, and the question remains, was the railroad company bound to take notice that the wire created a condition of things such as it might reasonably have been anticipated would result in accident and injury to some one for whose safety the corporation was bound to take due and reasonable precaution?

Actions in tort, to recover for injury to persons or property, ordinarily arise out of, or are predicated upon, acts or omissions which are or may be classified under the following divisions:

1. The action may be brought to recover for an injury caused by an act which was done purposely and wilfully, without lawful excuse or justifiable occasion, and with the actual or constructive intent to produce harm.

2. The injury may have resulted from the commission of a distinct legal wrong, or from the failure to discharge some special or absolute duty which in itself constituted an invasion of the rights of, or an infraction of the obligation due to another, who was without fault; or an act done or omitted in violation of a positive statute may have resulted in injury to some one within the protection and purpose of the statute, who was without fault materially contributing to the injury; there being in either case no intent or expectation on the part of the defendant that injury would result from the act or omission. Or,

3. The injurious act or omission may not have been done or omitted with any intent to produce harm, nor in the invasion of any distinct or absolute legal right of another, nor in violation of any positive law or special or absolute obligation; nevertheless injury may have resulted therefrom which, in the exercise of due diligence and skill, might have been foreseen and prevented, and the person upon whom the injury

has fallen may have been one for whose safety and protection the defendant was at the time under some qualified or limited obligation.    Pollock Torts, 19;    Cooley Torts, 85; *Bennett* v. *Ford*, 47 Ind. 264;    *Brown* v. *Kendall*, 6 Cush. 292.

It is important, therefore, in each particular case, that regard be had to the class within which the facts bring it. When the facts are such as to bring a case within either the first or second of the above divisions, the act itself constitutes the wrong, and fixes the right of action, leaving the amount of recovery to depend upon the injury which the evidence may show followed as a sequence of the act. " The test is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies which might arise."  *Lane* v. *Atlantic Works*, 111 Mass. 136.

True, if the question be whether or not the injurious act was purposely committed, it may aid in arriving at a conclusion to inquire whether or not the wrong-doer had knowledge of such facts as rendered it probable that he contemplated or anticipated, or was bound to anticipate, the result which followed.    It remains true, nevertheless, as a general proposition, that the commission of the wrongful act, under the circumstances above supposed, fixes the right of action.

Where, however, an action is predicated upon an injury resulting from an act or omission which could only become tortious on account of the relations which the parties sustained to each other, and where the very substance of the wrong complained of itself was the failure to act with due foresight, then the right of action depends primarily upon so fixing the relation of the parties as to show the defendant's obligation, and upon showing further that the harm and injury complained of was such as a reasonable man in the defendant's place should have foreseen and provided against.

In such a case it is not enough to show that an accident happened, and that death or injury resulted therefrom.

Negligence is not to be presumed from the fact of an occurrence like that involved in the present case, the statement of which suggests its anomalous, exceptional and extraordinary character.

This is not, therefore, a case in which mere proof of the accident casts upon the defendant the burden of showing the real cause of the injury. *Hammack* v. *White*, 11 C. B. (N. S.) 588 (593); *Baker* v. *Fehr*, 97 Pa. St. 70; *Nolan* v. *Shickle*, 3 Mo. App. 300; *Schultz* v. *Pacific R. R. Co.*, 36 Mo. 13, 32.

Where an event takes place, the real cause of which can not be traced, or is at least not apparent, it ordinarily belongs to that class of occurrences which are designated as purely accidental; and in a case like this, where the plaintiff asserts negligence, he must show enough to exclude the case from the class of accidental occurrences.

It is true, the plaintiff's intestate was at the place where he sustained the fatal injury upon lawful business with, and in a sense upon the invitation of, the railroad company. The company, therefore, owed him the duty to have its premises in a reasonably safe condition, and to prevent damage to him, and all others having lawful occasion to transact business with it, from any unseen or unusual danger of which it had, or of which by the exercise of reasonable vigilance it should have had, knowledge. *Indermaur* v. *Dames*, L. R. 1 C. P. 274; *Gilbert* v. *Nagle*, 118 Mass. 278; *Pennsylvania Co.* v. *Marion*, 104 Ind. 239.

The relation and obligation of the parties are accurately expressed in the proposition found in the recent case of *Heaven* v. *Pender*, L. R. 11 Q. B. Div. 503, the substance of which is, that, whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary prudence would recognize that if he did not use ordinary care and skill in his own conduct, with regard to these circumstances, he might cause injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger.

The obligation of the railway company did not, however,. require it to make the place absolutely safe. It was not required to make accidents impossible. Its duty was not to. allow its depot and grounds, to and upon which people were invited to come, to become more dangerous than such a place would reasonably be, having regard for the necessities of its. business and the nature of the contrivances necessarily employed in carrying it on.

The case, therefore, stands upon a different footing from the cases which involve the duties of carriers who contract. to carry passengers safely to a particular destination. In such cases proof of an injury ordinarily establishes a *prima. facie* case of negligence in favor of a passenger which the carrier must overcome. *Cleveland, etc., R. R. Co.* v. *Newell,* 104 Ind. 264 (54 Am. R. 312).

Where, as in the case under consideration, the obligation is not in its nature so nearly absolute, and the circumstances. of the accident suggest, at first blush, that it may have been unavoidable, notwithstanding ordinary care, the plaintiff charging negligence assumes the burden of proving that the defendant has, by some act or omission, violated a duty incumbent on it, from which the injury followed in natural sequence. *The Nitro-Glycerine Case,* 15 Wall. 524; *Mitchell* v. *Chicago, etc., R. W. Co.,* 51 Mich. 236 (47 Am. R. 566); Patterson Railway Accident Law, section 373.

We are not unmindful of those cases in which it appeared that persons passing along public streets or highways had sustained injury by being struck with dangerous substances. thrown, or by the falling of objects from buildings into public streets. It has been held that from the happening of such an accident, in the absence of explanatory circumstances,. negligence will be presumed. These cases go upon the theory that the injurious thing was inherently and intrinsically dangerous, hurtful and insecure, and that it was hence necessary for the defendant to show that he was exercising reason-

able care at the time of the accident.   *Mullen* v. *St. John*, 57 N. Y. 567 (15 Am. R. 530); Pollock Torts, 421.

Taking the admitted or established facts, and those most favorable to the plaintiff, and the inquiry in the present case must be, does it appear, or can it be inferred, that the railroad company failed to observe such precaution for the safety of the plaintiff's decedent, and others similarly situate, as ordinarily regulates the conduct of reasonable men? or can it be inferred from the evidence that reasonable men engaged in like business would have anticipated and provided against the accident which happened? If no such inference could properly have been drawn, then there was no wrong; the company was not negligent, and there is no liability.

"If, in the prosecution of a lawful act, a casualty purely accidental arises, no action can be supported for an injury arising therefrom." The party upon whom such an injury chances to fall, no matter how much our sympathies may be excited in his behalf, is necessarily left to bear it. *Lewis* v. *Flint, etc., R. W. Co.* 54 Mich. 55; *Bennett* v. *Ford, supra.*

Mischief, which could by no reasonable possibility have been foreseen, and which no reasonable person would have anticipated, can not be taken into account as a basis upon which to predicate a wrong. "Now a reasonable man," says a recent learned author, "can be guided only by a reasonable estimate of probabilities. If men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things." Pollock Torts, 36.

The proper inquiry is not whether the accident might have been avoided if the company had anticipated its occurrence,

but whether, taking the circumstances as they then existed, the company was negligent in failing to anticipate and provide against the occurrence. *Beatty* v. *Central Iowa R. W. Co.*, 58 Iowa, 242 (8 Am. & Eng. R. R. Cases, 210).

The duty imposed does not require the use of every possible precaution to avoid injury to individuals, nor that the company should have employed any particular means which it may appear after the accident would have avoided it. It was only required to use such reasonable precautions to prevent accidents as would have been adopted by prudent persons prior to the accident. *Chicago, etc., R. R. Co.* v. *Stumps*, 55 Ill. 367.

These principles are illustrated in a great variety of cases, some of which may with propriety be referred to more particularly.

In *Sjogren* v. *Hall*, 53 Mich. 274, the plaintiff, by some accident not explained, lost his leg by being caught in a wheel connected with the operation of a saw-mill in which he was employed. The plaintiff claimed that the defendant was negligent in leaving the wheel uncovered, and that at a very small expense the accident could have been prevented. COOLEY, J., delivering the opinion of the court, said : "If the accident which occurred was one at all likely to happen—if it was a probable consequence of a person working about the wheel that he would be caught in it as the plaintiff was,—there would be ground for pressing this argument. But the accident can not be said to be one which even a prudent man would have been likely to anticipate. * * * * So far as there is a duty resting upon the proprietor in any of these cases, it is a duty to guard against probable dangers ; and it does not go to the extent of requiring him to render accidental injuries impossible." *Richards* v. *Rough*, 53 Mich. 212; *Mitchell* v. *Chicago, etc., R. W. Co.*, *supra*.

So, in the case of *City of Allegheny* v. *Zimmerman*, 95 Pa. St. 287 (40 Am. R. 649), which was a suit to recover for injuries sustained by the falling of a liberty pole which had

been erected in the street, it was held, following the general rule, that " one is answerable in damages for the consequences of his faults only so far as they are natural and proximate, and may therefore have been foreseen by ordinary forecast, and not for those arising from a conjunction of his own faults with circumstances of an extraordinary nature." *Fairbanks* v. *Kerr*, 70 Pa. St. 86 ; *Baker* v. *Fehr*, 97 Pa. St. 70; *Hoag* v. *Lake Shore, etc., R. R. Co.*, 85 Pa. St. 293 (27 Am. R. 653).

*Loftus* v. *Union Ferry Co.*, 84 N. Y. 455 (38 Am. R. 533), involved analogous principles. That was a suit predicated upon a charge of negligence in maintaining an insufficient guard on the side of a float used by passengers going upon and leaving the ferry-boat. In some manner, not clearly explained, a child, in leaving the ferry-boat in company with its mother, fell through or over the guard and was drowned. The float had been used for five or six years before the accident, and was similar to the floats at other ferries. Great numbers of persons had passed over it, and no accident had happened before. The court, giving judgment for the defendant, said : " It was possible for the defendant so to have constructed the guard, that such an accident as this could not have happened ; and this, so far as appears, could have been done without unreasonable expense or trouble. If the defendant ought to have foreseen that such an accident might happen, or if such an accident could reasonably have been anticipated, the omission to provide against it would be actionable negligence. But the facts rebut any inference of negligence on this ground. The company had the experience of years, certifying to the sufficiency of the guard. * * That this was likely to occur was negatived by the fact that multitudes of persons had passed over the bridge without the occurrence of such a casualty." *Dougan* v. *Champlain, etc., Co.*, 56 N. Y. 1 ; *Crocheron* v. *North Shore, etc., Co.*, 56 N. Y. 656 ; *Cleveland* v. *New Jersey, etc., Co.*, 68 N. Y. 306 ; *Burke* v. *Witherbee*, 98 N. Y. 562 ; *Marsh* v. *Chickering*, 101 N. Y. 396.

416    SUPREME COURT OF INDIANA,

The Wabash, St. Louis and Pacific Railway Co. v. Locke, Administrator.

*Crafter* v. *Metropolitan R. W. Co.*, L. R. 1 C. P. 300, was a suit to recover for an injury occasioned by the plaintiff falling on a stairway, which the defendant's duty required it to keep in a safe condition. The cause of the slipping was that the brass nosing of the stairs had been worn smooth by travel over it, and a builder testified that in his opinion the staircase was unsafe on account of the smooth condition of the nosing and the absence of a hand-rail. There was nothing to contradict this, except that great numbers of persons had passed over the stairs, and that no accident had ever happened before. Setting aside a verdict for the plaintiff, the court held there was no evidence of negligence. *Blyth* v. *Birmingham Waterworks Co.*, 11 Ex. 781; *Metropolitan R. W. Co.* v. *Jackson*, L. R. 3 App. C. 193; *Sharp* v. *Powell*, L. R. 7 C. P. 253.

In a very recent case it appeared that a passenger seated in a railway car was injured by the falling of a clothes-wringer from the rack above the seat, another passenger having placed it there. There was no evidence that the position of the wringer in the rack was such as to indicate that it was insecure, or that there was any reason to anticipate that an accident might happen. It was held that the failure of the trainmen to notice the wringer, or, if noticed, to order its removal, was not negligence. *Morris* v. *New York Central, etc., R. R. Co.*, 9 Cent. Rep. 288.

These cases, to a greater or less extent at least, go upon the theory that persons who are charged with a duty in relation to a particular matter or thing have a right to rely upon the sufficiency of a structure or contrivance, such as is in common use for the purpose, and which has been in fact safely used under such a variety of conditions as to demonstrate its fitness for the purpose. When a structure or appliance, such as is in general use, has uniformly answered the purpose for which it was designed and used, under every condition supposed to be possible in the business, it can not in reason be said that a person has not acted with ordinary

The Wabash, St. Louis and Pacific Railway Co. v. Locke, Administrator.

prudence and sagacity in not anticipating an accident which afterwards happens in the use of the thing, notwithstanding it continued substantially in the same condition all the time. Of course, if the structure or thing was inherently danger- ·ous, or had become intrinsically insecure, and the person who was responsible for its safety had actual or constructive notice of its condition, the fact that it had been used before without injury would not exempt the person so responsible from liability when an accident happened on account of its defective condition. So, also, if the thing which occasioned the accident was inherently dangerous or insecure, the fact that no such occurrence had ever taken place before would not be conclusive evidence that due caution was observed. Extraordinary and unusual occurrences are not to be as readily anticipated, under any circumstances, as are those which frequently happen.

The rule deducible from the authorities in cases analogous to the present is, that in order that liability shall attach for an injury occasioned by something not inherently dangerous and defective, which is found upon the grounds of, or in use by, one who is under a qualified obligation to the injured person, it must be shown that the defendant either knew, or that, by the exercise of such reasonable skill, vigilance and sagacity as are ordinarily possessed and employed by persons experienced in the particular business to which the thing pertains, he should have known of its defective and dangerous condition, and that the natural and probable consequence of its use would be to produce injury to some one. *City of Chicago* v. *Starr*, 42 Ill. 174; *Joy* v. *Winnisimmet Co.*, 114 Mass. 63; *Lane* v. *Atlantic Works*, 111 Mass. 136.

Is there anything in the evidence to show that a prudent person, prior to the unfortunate accident which gave rise to this suit, would have regarded the wires crossing the tracks in the manner described as a source of probable danger to persons at or about the railroad company's depot and grounds?

The evidence shows affirmatively that it was not so regarded. There is no law fixing the height at which telegraph wires shall be maintained at points where they cross railroads or other highways. Their height must, therefore, be regulated primarily so as not to put in jeopardy the safety of those who have occasion to pass under them by the customary modes, and, incidentally, so as not to unnecessarily expose others, who have occasion to come where they are, to danger.

A telegraph wire carried from one pole to another is not in and of itself a dangerous object. If it should become unfastened, or detached from one or more of the poles which carried the wire, and should fall to the ground or upon some one, it would not under ordinary circumstances put life or limb in jeopardy. It could only become a source of danger to persons other than those who came in contact with it, by some combination of circumstances or conjunction of forces, beyond the telegraph wire itself.

Now, the railroad company was only bound to anticipate such combinations of circumstances, and accidents and injuries therefrom, as, taking into account its own past experience and the experience and practices of others in similar situations, together with what was inherently probable in the condition of the wires as they related to the conduct of its business, it might reasonably forecast as likely to happen.

Naturally, the first and chief consideration would be as to the height of the wires above the track, so as to make them safe for those whose duty required them to pass under on the top of trains. Upon this subject, what are the facts? All those connected with the railroad and telegraph service, including the " tall brakeman," unite in saying that it never occurred to any of them before the day of the accident that there was any danger, or that contact with the wires was ordinarily possible. On that day, by a combination of extraordinary circumstances, not at all satisfactorily explained, the brakeman already mentioned did what to him, and all others connected with the service, so far as the evidence

shows, seemed up to that moment impossible. He came un-expectedly in contact with the wire, with the result already mentioned.

Now, if any dependence is to be placed in the testimony of human witnesses, who are wholly uncontradicted, it is very clear that neither the brakeman who came in contact with the wire, nor any other employee of the railway company, could have maintained an action against it for an injury from the telegraph wires. This is so, because all of them testify that they passed under it daily and always considered it safe. As is said in *Burke* v. *Witherbee, supra,* a case closely analogous in principle : " Under such circumstances can the defendants be charged with negligence? Were they bound to know more than every one else? Ought they to have perceived danger that was not visible to any one else, and which those whose lives were most exposed were not sufficiently wise or vigilant to foresee?"

In *Baltimore, etc., R. R. Co.* v. *Rowan,* 104 Ind. 88, the liability of a railroad company for an injury to one of its brakemen, who came in contact with an overhead bridge, was made to depend upon the following propositions:

1. The maintenance of a bridge over the railroad track at an insufficient height to enable brakemen to discharge their duties in safety.

2. Knowledge by the railroad company that the bridge was dangerous.

3. Ignorance of the brakeman that it was dangerous for him to undertake the duties imposed upon him while passing under the bridge.

Every element of liability as set forth in the case cited is absent in the present case.

If, then, the railroad company maintained its track, and the wires crossing over it, so that it discharged its duty to those whose safety was directly and primarily involved, could it reasonably have anticipated an accident such as the one which happened?

There is no evidence in the record which enables us to answer this inquiry in the affirmative. Of course, we do not mean to say that there might not have been circumstances which would have defeated an action by the brakeman who came in contact with the wire, and yet have permitted a recovery by an injured third person. If, through the fault or negligence of the brakeman, the wire had been thrown down, and the injury of the decedent had resulted, there would be no doubt but that a recovery might be had. No one pretends, however, that the brakeman was in fault. His contact with the wire was wholly unexpected and a surprise to him.

He relied upon the fact that he had passed under it daily, and was, therefore, fully justified in supposing he could pass under safely again. That he acted as he did is a circumstance which indicates almost conclusively that his contact with the wire was the result of a combination of circumstances that the railroad company could not have foreseen. Upon the broadest assumption that the appellee makes of the facts, this must be so. Take it, and this is the most that it is claimed the evidence shows, that one of the wires "sagged" so that a brakeman some inches above the average height of men, happening at the moment of passing under the wire to stand erect upon a car some inches above the average height of cars, came in contact, by, say three to three and a half inches, with the wire, and can it be said that the company, notwithstanding this brakeman and all others supposed the wire to be above the possibility of contact, must have anticipated, not only the remarkable conjunction of the depressed wire with the tall brakeman erect upon a high car, but that it must have looked beyond the brakeman thus situate, and anticipated that the wire might be knocked down—which in itself would ordinarily have hurt no one—and that such a combination of circumstances would then follow as might result in serious injury to some one? Unless the rule is to be that everything which by any possibility may happen is to be anticipated and provided against, or that because

a thing has happened it must have been anticipated, there can be no liability on the facts proven in this case.

But it is said, finally, that it was the peculiar province of the jury to determine whether or not the railroad company was guilty of negligence in not anticipating and providing against the accident which resulted in the intestate's death. Hence, it is argued, the jury, having found a verdict for the plaintiff, must have determined that the railroad company was negligent, and, as this court under the rule can not weigh the evidence, that should be the end of the matter.

While it is quite true that it is the duty of the jury, under proper instructions, to determine whether or not upon any given state of facts negligence *ought* to be inferred, it is nevertheless the duty of the court first to say whether, upon the facts most favorable to the plaintiff, negligence *can* be inferred. It is settled law that the jury can not arbitrarily, and without evidence, infer negligence. "When the evidence fails to establish the defendant's duty, and its non-performance—that is, when the evidence is equally consistent with the existence or non-existence of negligence"—there is no evidence which justifies the jury in finding negligence. *Toledo, etc., R. W. Co.* v. *Brannagan*, 75 Ind. 490; *Searles* v. *Manhattan R. W. Co.*, 101 N. Y. 661; Patterson Railway Accident Law, section 373, and cases cited in note 5.

The evidence must affirmatively establish circumstances from which the inference fairly arises that the accident resulted from the want of some precaution which the defendant ought to have taken. *Hayes* v. *Michigan Central R. R. Co.*, 111 U. S. 228.

"The judge," said the Lord Chancellor in *Metropolitan R. W. Co.* v. *Jackson, supra,* "has a certain duty to discharge, and the jurors have another and a different duty. The judge has to say whether any facts have been established by evidence from which negligence *may be* reasonably inferred ; the jurors have to say whether, from those facts, when submitted to them, negligence *ought to be* inferred. It is, in

my opinion, of the greatest importance in the administration of justice that these separate functions should be maintained, and should be maintained distinct. It would be a serious inroad on the province of the jury, if, in a case where there are facts from which negligence may reasonably be inferred, the judge were to withdraw the case from the jury upon the ground that, in his opinion, negligence ought not to be inferred; and it would, on the other hand, place in the hands of the jurors a power which might be exercised in the most arbitrary manner, if they were at liberty to hold that negligence might be inferred from any state of facts whatever."

The rule as thus stated has often been recognized by the courts of this country. *Randall* v. *Baltimore, etc., R. R. Co.*, 109 U. S. 478; *Gregory* v. *Cleveland, etc., R. R. Co., ante,* p. 385; *Conner* v. *Citizens, etc., R. W. Co.*, 105 Ind. 62, and cases cited; *Woolery* v. *Louisville, etc., R. W. Co.*, 107 Ind. 381, and cases cited; Pollock Torts, 365.

We have been unable to discover any evidence in the record of the present case from which a reasonable inference can fairly arise that the railroad company had omitted any precaution which prudent persons engaged in like business would have taken.

There are other questions in the record, but as they may not arise again in case of another trial, if there should be one, we do not now consider them.

The judgment is reversed, with costs, with directions to the court below to sustain the appellant's motion for a new trial.

Filed Nov. 30, 1887.